MATTHEW PEKRUN,
    Plaintiff,

v.                                             Case No. 13-C-1397

THEORDORE PUENTE and
CITY OF MILWAUKEE,
    Defendants.

## DECISION AND ORDER

Matthew Pekrun alleges that Theodore Puente, an officer with the Milwaukee Police Department, used excessive force against him during an arrest, in violation of the Fourth Amendment. He brings this action under 42 U.S.C. § 1983 against Puente and the City of Milwaukee. Before me now is the defendants' motion for summary judgment on Pekrun's claim against Puente in his individual capacity. The defendants contend that Puente did not violate Pekrun's Fourth Amendment rights and that, even if he did, he is entitled to qualified immunity.

### I. FACTS

In the early morning hours of November 8, 2008, Matthew Pekrun went for a walk through a neighborhood in the City of Milwaukee. Pekrun was 22 years old at the time and was wearing an Army-style camouflage coat over a hooded sweatshirt. During the course of the walk, Pekrun found a flathead screwdriver. Also during the walk, Pekrun stole a bicycle that he found in someone's driveway. Pekrun described the bicycle as a girl's mountain bike that was made for a teenager.

At the same time that Pekrun was out walking, Puente was sleeping on the floor of his living room. Puente's dog had just undergone shoulder surgery, and Puente was sleeping on the living room floor with the dog. At about 4:00 or 5:00 a.m., the dog growled and awakened Puente. Puente got up and looked out the window. He saw a man in his driveway looking through the rear window of a car parked in the driveway. The man was Pekrun. The car belonged to Puente's girlfriend, who was asleep in the house. Puente had never seen Pekrun before, and he could not make out his facial features. However, he could see that the man was white and that he was wearing a camouflage jacket. Puente thought he saw Pekrun pull on the car door handle and then look into the window a second time. Puente grabbed his service weapon and Milwaukee Police Department identification and went outside.

By the time Puente was outside, Pekrun was gone. Puente looked around for a couple of minutes and then went back inside. By this time, Puente's girlfriend was up, and she told Puente that she saw a person running down a nearby street. Puente then put on some civilian clothing, including a sweater and a down-type jacket, and went back outside. He brought his service weapon, his MPD identification, some pepper spray, and his cellular telephone.

Puente walked around his neighborhood for 20 minutes. Initially, he did not observe anything significant. However, when Puente was about five blocks from home, he saw a man in a camouflage jacket approaching on a bicycle. Puente concluded that the man was the person who had looked into his girlfriend's car. And in fact, the person on the bicycle was Pekrun. When Pekrun drew near, Puente said "I've got you now motherfucker," and struck him in the head with his gun, causing Pekrun to fall off of the

2

bicycle. Puente then sprayed Pekrun in the eyes with pepper spray. Puente contends that after he knocked Pekrun off the bicycle, he identified himself as a police officer. Pekrun contends that Puente did not identify himself as a police officer until later, and that at the time Puente knocked him off of the bicycle, he thought someone was trying to rob him.

After being knocked off of the bicycle, Pekrun got up and ran down the street. Puente pursued him and, when he caught up, grabbed Pekrun by his ponytail and hit him in the head with the butt of his pistol multiple times. Puente also sprayed Pekrun in the face with pepper spray a second time. However, Pekrun escaped again and ran into someone's backyard. Puente pursued Pekrun into the backyard, grabbed him by his hood or ponytail, and continued to strike him in the head with his pistol. Pekrun then ran to the front of the house. Puente caught him again and continued to strike at his head with the butt of his pistol. As best Pekrun can remember, this was the first time that Puente told Pekrun that he was a police officer. *See* Pekrun Dep. at 42. Puente then told Pekrun that he had a gun and would shoot him. Pekrun contends that he told Puente that if he showed him his badge, he would stop running. However, Puente did not show Pekrun his badge or his MPD identification, and Pekrun continued to run.

Pekrun ran across a street and into the front yard of a school. At the school, Puente grabbed Pekrun by his ponytail and struck him in the head with the butt of his pistol a couple more times. Pekrun again escaped, was caught, and was struck with the pistol several more times. At some point, Pekrun told Puente to get away from him and to leave him alone. Pekrun then ran into another backyard, toward some bushes. This time, when Puente caught him, he tried to strike Pekrun in the neck area with the butt of

3

his pistol, hoping to knock the plaintiff unconscious. Still, Pekrun was able to escape, and he ran down a hill to a parking lot, where Puente caught him again and continued to strike him with the butt of the pistol. Pekrun ran across the street to another parking lot. At various points during the chase through the neighborhood, Puente pepper sprayed Pekrun several more times.

According to Pekrun, when Puente caught up to him in the second parking lot, Pekrun put his forearms over his head to defend himself from Puente's blows. Pekrun then turned and began to run away. When Pekrun was about three steps away from Puente, Puente fired four shots at him. Pekrun was hit twice in the back and once in the back of his left elbow. *See* Pekrun Dep. at 58–59.

Following the encounter, the State of Wisconsin charged Pekrun with first-degree recklessly endangering safety. At the trial, Puente testified that in the moments before he shot Pekrun, Pekrun came at him while making a downward stabbing motion. Puente did not see a weapon in Pekrun's hand, but he felt two impacts to his left shoulder, one of which was very painful. At that point he concluded that Pekrun must have a weapon. After examining his shoulder, Puente looked back at Pekrun and interpreted his stance as an attack posture. Puente then fired the four shots at Pekrun, hitting him three times. It turned out that Puente had been struck with the screwdriver that Pekrun had picked up earlier on his walk. Pekrun has no memory of striking Puente with the screwdriver, but after the encounter, Puente received treatment from paramedics for two abrasions, each about about one centimeter in length, on his shoulder and triceps.

4

## II. DISCUSSION

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I take the evidence in the light most favorable to the non-moving party and may grant the motion only if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

A police officer's use of force against a citizen is a seizure subject to the reasonableness requirement of the Fourth Amendment. *California v. Hodari D.*, 499 U.S. 621, 626 (1991); *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. *Graham v. Connor*, 490 U.S. 386, 396 (1989). Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Id.* The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Id.* The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense,

5

uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.  *Id.* at 396–97. The "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.  *Id.* at 397.

In the present case, Officer Puente first used force against Pekrun when he struck him in the head with his pistol, knocking him off of the bicycle.  This form of force qualifies as either intermediate or deadly force, and thus constitutes a serious intrusion onto a citizen's Fourth Amendment interests.  *See Sallenger v. Oakes*, 473 F.3d 731, 740 (7th Cir. 2007) (blows to the head with a fist or flashlight may constitute deadly force); *Young v. County of Los Angeles*, 655 F.3d 1156, 1161–62 (9th Cir. 2011) (baton blows are a form of intermediate force that "present a significant intrusion upon an individual's liberty interests").  Before using such force, Puente did not identify himself as a police officer,[1] did not order Pekrun to stop, and did not warn Pekrun that he would use force against him if he did not stop.  At that point in time, Puente suspected that Pekrun had committed only very minor offenses—loitering and prowling, which in Milwaukee are ordinance violations rather than crimes.  *See* Milwaukee Code of Ord. § 106-31.  Also at that point in time, Pekrun had not engaged in any behavior to suggest that he posed a threat to anyone's safety or that he might flee if ordered by a police officer to stop.  Under these facts, a jury could reasonably conclude that Puente's initial

---

[1] As discussed in more detail below, there is a factual dispute concerning when Puente first told Pekrun that he was a police officer.  However, even under Puente's version of events, he did not tell Pekrun that he was a police officer until after he had stuck him in the head with his pistol.  *See* Def. PFOF ¶¶12–13.

6

use of force against Pekrun was unreasonable: without ordering Pekrun to stop or informing him that he was a police officer, Puente used significant force against a person who was suspected of committing only a minor offense, posed no immediate threat to the safety of the officer or others, and was not actively resisting arrest or attempting to evade arrest by flight. *See Graham*, 490 U.S. at 396; *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 732 (7th Cir. 2013) (noting that it is well established in the Seventh Circuit that police officers cannot use significant force on nonresisting or passively resisting suspects); *Payne v. Pauley*, 337 F.3d 767, 779 (7th Cir. 2003) (holding that officer's use of less than lethal force on suspect was objectively unreasonable where suspect was not threatening to harm the police officer or anyone else at the scene, was not resisting or evading arrest, was not attempting to flee, and was charged with minor offenses); *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996) ("police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever"); *see also Young*, 655 F.3d at 1166–67 ("it is rarely necessary, if ever, for a police officer to employ substantial force without warning against an individual who is suspected only of minor offenses, is not resisting arrest, and, most important, does not pose any apparent threat to the officer or public safety."); *Grawey v. Drury*, 567 F.3d 302, 311 (6th Cir. 2009) ("An officer has used excessive force when he pepper sprays a suspect who has not been told she is under arrest and is not resisting arrest."); *Walker v. City of Riviera Beach*, 212 F. App'x. 835, 839 (11th Cir. 2006) (holding that it is "obviously unconstitutional" for an officer to pistol whip a suspect who is suspected of only a minor crime, was not attempting to flee, and was not threatening the officer or anyone else).

Puente argues that his pistol whipping Pekrun without warning and without first ordering him to stop was reasonable because he was on foot, not in uniform, and had no partner to help him stop and subdue Pekrun. Br. in Supp. at 14. However, Puente had with him his pepper spray, his service weapon, and his MPD identification. Further, Puente had no cause to believe that Pekrun was violent, that he had committed a serious crime, or that he would attempt to flee from the police if ordered to stop. Thus, when Puente saw Pekrun riding his bicycle towards him, he could have verbally identified himself as a police officer, held out his MPD identification, and ordered Pekrun to stop before resorting to force.

Puente argues that if he had ordered Pekrun to stop, Pekrun might have attempted to escape or to attack him. It is of course possible that Pekrun might have attempted to do these things, but that possibility exists in every police encounter with a citizen and does not by itself justify the use of force. *See Ellis v. Wynalda*, 999 F.2d 243, 246–47 (7th Cir. 1993) (police officer is not entitled to assume that a felon is carrying a weapon simply because it is possible that every felon might be carrying a weapon, and the officer may use force designed to prevent the felon from using a weapon only if the officer has a "particular reason to believe" that the suspect is armed); *Clash*, 777 F.3d at 1048 ("police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever"). When Puente first used force against Pekrun, Pekrun had engaged in no behavior that suggested he was violent or likely to flee from the police, and he was suspected of having committed only very minor offenses. Thus, a reasonable jury could conclude

8

that Puente had no cause to use substantial force against Pekrun without first ordering him to stop or providing him with a warning.

I next address whether Puente used excessive force after knocking Pekrun off of the bicycle. During this period, Puente repeatedly struck Pekrun in the head and neck with his gun, repeatedly pepper sprayed him, and eventually shot him three times. Puente contends that his using these forms of force was reasonable because Pekrun attempted to evade arrest and, just before the shooting, attacked Puente with the screwdriver. If Puente's version of events were accepted as true, then perhaps his actions could be considered reasonable. *See Scott v. Edinburg*, 346 F.3d 752, 757 (7th Cir. 2003) ("when an individual threatens a police officer with a deadly weapon, the officer is permitted to use deadly force in self-defense if the use is consistent with the principles set forth in *Tennessee v. Garner*); *Smith v. City of Chicago*, 242 F.3d 737, 743–44 (7th Cir. 2001) (holding that if a reasonable officer would think that a suspect who had committed a minor traffic violation was trying to flee, the officer may use a higher degree of force to protect the community and the officers than would otherwise be justified). However, under Pekrun's version of events, Puente did not identify himself as a police officer until well after he began using force.[2] Moreover, even after Puente

---

[2] An initial question is whether there is a genuine factual dispute concerning when Puente first verbally identified himself as a police officer. According to Pekrun's deposition testimony, Puente did not say he was a police officer until well into his pursuit of Pekrun through the various streets, yards, and parking lots in which the chase occurred. *See* Pekrun Dep. at 42. According to Puente's testimony, he told Pekrun he was a police officer immediately after knocking him off of the bicycle. Clearly the parties' conflicting testimony creates a genuine factual dispute as to when Puente first verbally identified himself as an officer. However, the defendants contend that Pekrun's deposition testimony contradicts a statement he made to police detectives while he was in the hospital receiving treatment for the wounds he suffered in the encounter. In that

9

said he was an officer, Pekrun asked to see his badge, but Puente did not produce the badge or the MPD identification he was carrying with him. According to Pekrun, Puente's actions caused him to think he was being attacked by a stranger and robbed. Thus, Pekrun claims, when he attempted to escape and eventually struck Puente with the screwdriver, he was simply trying to protect himself from an unknown assailant, not resisting arrest.

The Seventh Circuit has held that when a person has no reason to know that someone is a police officer, and the officer's identity is concealed, the normal rules governing use of deadly force and right to resist are modified. *Sledd v. Lindsay*, 102

---

statement, the defendants argue, Pekrun told the detectives that Puente told him he was a police officer immediately after knocking him off of the bicycle. According to the defendants, Pekrun is bound by his earlier statement, and therefore his deposition testimony constitutes "sham testimony" that must be disregarded for purposes of summary judgment. *See* Def. Resp. to Pl.'s PFOF ¶ 15. The rule on which the defendants rely is known as the "sham affidavit" rule. This rule provides that an affidavit is inadmissible when it contradicts the affiant's previous sworn testimony unless the earlier testimony was ambiguous, confusing, or the result of a memory lapse. *See, e.g., Cook v. O'Neill*, 803 F.3d 296, 298 (7th Cir. 2015). The rule is designed to avoid sham factual issues and prevent parties from taking back concessions that later prove ill-advised. *United States v. Funds in the amount of 271,080*, __ F.3d __ (7th Cir. 2016). The Seventh Circuit has emphasized that the rule is to be used with "great caution." *Id.* In the present case, the sham affidavit rule does not bar consideration of Pekrun's deposition testimony. Pekrun's earlier statement was not made under oath or under penalty of perjury; it was simply a statement that Pekrun made to the police during an interview in a hospital. No case cited by the defendants, or which I have found, prohibits a party from opposing summary judgment with an affidavit or deposition testimony that contradicts a prior unsworn statement. To the contrary, the cases indicate that the sham affidavit rule applies only when the prior statement was sworn or made under penalty of perjury. *See United States v. $272,080*, __ F.3d at __; *United States v. Funds in the amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d 448, 466 (7th Cir. 2005). In any event, Pekrun's deposition testimony does not clearly contradict his statement to the detectives. In the statement, Pekrun does not unambiguously state that Puente identified himself as an officer immediately after knocking him from the bicycle. Thus, even if the sham affidavit rule could apply to an unsworn statement, here that statement is ambiguous and does not bar the later testimony.

10

F.3d 282, 288 (7th Cir. 1996); *see also Marshall ex rel. Gossens v. Teske*, 284 F.3d 765, 771--72 (7th Cir. 2002) (noting that officers cannot assume that a suspect is fleeing from police when a reasonable officer should have known that the suspect did not realize his pursuers were police officers); *Yates v. City of Cleveland*, 941 F.2d 444, 447 (6th Cir. 1991) (officer's use of deadly force is objectively unreasonable when he initiates an encounter with a suspect without identifying himself as an officer, causing the suspect to believe that the officer is an intruder). As applied to the present case, this means that if a reasonable officer in Puente's position would have known that when Pekrun tried to get away he was trying to protect himself rather than evade arrest, Puente's using intermediate and deadly force against him would be unreasonable.[3] And I conclude that, when the facts are viewed in the light most favorable to Pekrun, a reasonable jury could conclude that Puente should have known that Pekrun was not knowingly fleeing from an officer, but instead was trying to flee from an unknown assailant. The encounter occurred in the middle of the night, and Puente initiated the encounter by pistol whipping Pekrun and causing him to fall from the bicycle. This is how a criminal would initiate a robbery or an assault, not how a police officer would ordinarily initiate an arrest. Puente was not in uniform and was not wearing anything that would make Pekrun think he was dealing with a police officer rather than a criminal.

---

[3] The defendants emphasize that because the reasonableness of Puente's use of force must be measured by the facts known to a reasonable officer, Pekrun's subjective belief that he was being attacked by a criminal rather than a police officer is irrelevant. I agree that Pekrun's subjective belief is irrelevant and that the question is whether a reasonable officer in Puente's position would have known that his actions would cause a person in Pekrun's position to believe he was being attacked by a criminal rather than a police officer. *See Graham*, 490 U.S. at 396 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene . . . .").

11

Case 2:13-cv-01397-LA    Filed 03/23/16    Page 11 of 17    Document 63

Puente did not immediately identify himself as an officer, and Puente did not show Pekrun his MPD identification or his badge in response to Pekrun's requests to see his badge. Under these facts, a reasonable jury could conclude that Puente's use of intermediate and deadly force against a person who had committed only minor ordinance violations was objectively unreasonable.

As for the shooting itself, Puente contends that his use of deadly force was reasonable because Pekrun had just stabbed him twice with the screwdriver.[4] However, Puente's decision to use deadly force must be balanced against the possibility that a reasonable officer would have known that Pekrun used force to protect himself and escape from an unknown attacker, rather than to harm a police officer. And again, when the facts are viewed in the light most favorable to Pekrun, a reasonable jury could conclude that Puente should have known that Pekrun was simply trying to protect himself. Although by this time in the encounter Puente had claimed to be a police officer, he did not respond to Pekrun's requests to see his badge and did not produce his MPD identification. Thus, a jury could reasonably conclude that Puente should have known that Pekrun was still unsure of whether his attacker was a police officer when he defended himself with the screwdriver.

---

[4] Pekrun testified that he does not remember stabbing Puente with the screwdriver, and his counsel seems to contend that this creates a genuine factual dispute over whether he did. See Pl.'s Resp. to Def. PFOF ¶ 44. However, Pekrun does not dispute that Puente suffered two wounds during the encounter that suggest he had been stabbed by a screwdriver. See Pl. PFOF ¶ 34. Pekrun does not contend that Puente stabbed himself with the screwdriver in order to make it look like Pekrun had attacked him, and thus the only conclusion the jury could reasonably draw is that Puente suffered the wounds when Pekrun stabbed him with the screwdriver.

12

In any event, even if Puente was justified in using deadly force to protect himself from Pekrun's attack with the screwdriver, a question of fact remains as to whether that danger had passed by the time Puente fired the shots. *See Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993) ("When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity."). Under Puente's version of events, he shot Pekrun after feeling that he had been struck with something twice and looking up to see Pekrun standing in an attack posture. *See* Smokowicz Aff., Attachment C, at 199–200. Under Pekrun's version of events, which I must accept as true for purposes of this motion, Puente shot him in the back as he was running away. *See* Pekrun Dep. at 58–59. Thus, a reasonable jury could conclude that a reasonable officer in Puente's position would have known that, by the time he used deadly force, Pekrun was running away and no longer posed a danger to Puente.

Puente might argue that even if he should have known that the danger to himself had passed, he was nonetheless justified in shooting Pekrun because, by that point, he had cause to believe that Pekrun was armed and might have posed a danger to the community. *See Ellis*, 999 F.2d at 247 (noting that if suspect had threatened the officer with a weapon and then run off with the weapon, a reasonable officer could believe that the suspect created a danger to the community). However, because the jury could conclude that Puente should have known that Pekrun had used his weapon only to defend himself from an unknown attacker, rather than to inflict harm on a police officer, it could also conclude that Puente's use of deadly force was not justified by the need to protect the community from a violent felon. Thus, a reasonable jury could conclude that Puente's shooting Pekrun was objectively unreasonable.

13

The defendants next contend that even if Puente's conduct violated the Fourth Amendment, he is entitled to qualified immunity. Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier v. Katz*, 533 U.S. 194, 206 (2001). For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

I first address whether Puente is entitled to qualified immunity for striking Pekrun in the head with his pistol and knocking him from the bicycle, and I conclude that he is not. As discussed in the analysis above, it has long been clearly established that an officer cannot, without warning or ordering the person to stop, use intermediate or deadly force against a person who is suspected of only minor offenses, poses no immediate threat to the safety of the officer or others, and is not actively resisting arrest or attempting to evade arrest by flight. *See Graham*, 490 U.S. at 396; *Abbott*, 705 F.3d at 732; *Payne*, 337 F.3d at 779; *Clash v. Beatty*, 77 F.3d at 1048; *see also Young*, 655 F.3d at 1166–67; *Grawey*, 567 F.3d at 311; *Walker*, 212 F. App'x. at 839. In support of his argument for qualified immunity, Puente cites *Gause v. Mullen*, in which a district

court found reasonable an officer's grabbing a bicyclist by the throat and slamming his face into the ground, even though the bicyclist had committed only a minor traffic violation. *See* No. CV 12–1439–PHX–RCB (MEA), 2013 WL 5163245, at *8–9 (D. Ariz. Sept. 12, 2013). However, in that case, the officer, who was in uniform, ordered the bicyclist to stop, and the bicyclist did not obey the order to stop. *Id.* at *1, 8–9. Only then did the officer resort to force. The case thus does not support Puente's argument that he is entitled to qualified immunity for pistol whipping the plaintiff without warning, without identifying himself as a police officer, and without ordering the plaintiff to stop.

I next address whether Puente is entitled to qualified immunity for his actions in repeatedly pepper spraying and pistol whipping the plaintiff during the course of their encounter. Again, I conclude that he is not. Puente's use of such force would have been reasonable only if a reasonable officer would have concluded that Pekrun was attempting to evade arrest. However, as discussed, the jury could reasonably conclude that, under the circumstances presented, a reasonable officer would have known that Pekrun was merely trying to escape from an unknown assailant, and that therefore Puente was not justified in using a degree of force that might be reasonable when a suspect is attempting to evade arrest. As of November 8, 2008, it was clearly established that "where a person has no reason to know that someone is a police officer, and the officer's identity is concealed, the normal rules governing use of deadly force and right to resist are modified." *Sledd*, 102 F.3d at 288. Thus, as of that date, Puente would have been on notice that he could not pistol whip and pepper spray a fleeing suspect who was not aware that the person he was fleeing from was a police officer and who had otherwise committed only a minor offense. *See also Marshall ex*

*rel. Gossens*, 284 F.3d at 771–72 (finding that officers who did not sufficiently identify themselves to a fleeing suspect, and who unreasonably assumed that the suspect was attempting to evade arrest, were not entitled to qualified immunity).

Finally, I address whether Puente is entitled to qualified immunity in connection with his decision to shoot Pekrun. As noted, there is a dispute of fact concerning whether, at the precise moment of the shooting, Pekrun was standing in an attack posture or was running away. There is also a dispute of fact as to whether Puente should have known that Pekrun did not know he was dealing with a police officer. If the jury finds that Puente shot Pekrun as he was running away and should have known that Pekrun had used the screwdriver only to defend himself from an unknown assailant, then Puente would not be entitled to qualified immunity. As of November 8, 2008, it was clearly established that an officer may not use deadly force against a person who is suspected only of minor offenses and who does not pose a danger to the community. *Garner*, 471 U.S. at 11; *Ellis*, 999 F.2d at 247 (holding that officer may not shoot fleeing suspect in the back without any indication that he had committed a violent felony or was dangerous). Moreover, although Puente might have been justified in using deadly force to prevent Pekrun from continuing to attack him with the screwdriver, the jury could reasonably conclude that by the time Puente fired the shots, Pekrun was running away and therefore the need to act in self-defense had passed. As of November 8, 2008, it was clearly established that "[w]hen an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity." *Ellis*, 999 F.2d at 247. It was also clearly established that an officer is not justified in using deadly force against a suspect who had initially attacked the officer but

then backed away, turned, and started to run. *Id.* Accordingly, Puente is not entitled to qualified immunity in connection with his decision to shoot Pekrun.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the defendants' motion for summary judgment is **DENIED**.

**IT IS FURTHER ORDERED** that the plaintiff's motion to file a sur-reply is **GRANTED**.

Dated at Milwaukee, Wisconsin, this 23rd day of March, 2016.

s/ Lynn Adelman
_____
LYNN ADELMAN
District Judge